Filed 3/29/16  Pinheiro v. County of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN PINHEIRO,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COUNTY OF FRESNO, et al.,<br><br>    Defendants and Respondents. | F070058<br><br>(Super. Ct. No. 13CECG02526)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Motschiedler, Michaelides, Wishon, Brewer & Ryan, and Russell K. Ryan, for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Michael G. Woods and Deborah A. Byron, for Defendants and Respondents.

-ooOoo-

Following his discharge from his position as labor relations manager for the County of Fresno (County), John Pinheiro (Pinheiro) sued the County, the County's Chief Administrative Officer (CAO) John Navarrette (Navarrette), and the County's director of personnel services Beth Bandy (Bandy) (collectively respondents), in a first

amended complaint that alleged defamation, three theories of invasion of privacy, intentional disclosure of personal information from government records, and intentional infliction of emotional distress. Respondents prevailed on their motion under Code of Civil Procedure section 425.16,[1] the anti-SLAPP (strategic lawsuits against public participation) statute, and were awarded attorney fees.

On appeal from the resulting judgment, Pinheiro argues the trial court erred in granting the anti-SLAPP motion because respondents did not meet their burden of showing that the allegations upon which his claims are based constitute protected activity under the statute, and he established a probability of prevailing on the merits. We agree with Pinheiro that the causes of action are not subject to an anti-SLAPP motion because the underlying statements were not made in connection with an issue under consideration or review in an official proceeding authorized by law and do not concern an issue of public interest, and reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Facts Leading to This Lawsuit*

Pinheiro was employed as the County's labor relations manager and personnel services manager in the division of personnel services. His job duties included managing the labor relations division and acting as the County's chief labor negotiator. He reported directly to Bandy, who in turn reported directly to Navarrette. Pursuant to the County's personnel rules, Pinheiro could be terminated only for cause.

Pinheiro's job was a high profile one, which he described in his original complaint as "one of the most important positions at the County." He acted as the County's chief spokesperson in negotiations with employee organizations, particularly with respect to high profile matters. He attended County board of supervisors meetings and sometimes addressed the media about subjects such as pay cuts. He also attended nearly all labor

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2.

relations closed sessions with the board of supervisors. Pinheiro managed the labor relations program and was responsible for planning, developing, implementing and evaluating labor relations goals, programs, policies and procedures. He also was responsible for supervising and evaluating others' work. His honesty, integrity and discretion were critical to the effective performance of his duties, as was having a "close working relationship" with Bandy.

Pinheiro performed well in his position and was commended regularly by members of the board of supervisors, Navarrette and Bandy. Bandy gave him an evaluation in February 2012,[2] which commended him for doing an excellent job. Bandy stated that Pinheiro had performed his duties and responsibilities "quite well" and noted it was unfortunate the County was not in a fiscal position to grant merit increases to managers because, if it were, she would recommend the maximum amount for Pinheiro based on his accomplishments over the past year. One category of evaluation was for "Integrity and Trust," which the evaluation form described as being "widely trusted," "seen as a direct, truthful individual[,]" being able to "present the unvarnished truth in an appropriate and helpful manner[,]" keeping confidences and admitting mistakes, being honest and ethical, and not misrepresenting oneself for personal gain. Pinheiro was given a rating of "M" in this category, meaning he "Meets Expectations." According to Pinheiro, before 2012 there were never any issues with his employment performance and he was never disciplined in any form.

In April, a Fresno Bee reporter called Bandy and told her that Pinheiro had been arrested for petty theft. Bandy provided the information to Navarrette. Sometime later, an officer with the sheriff's department contacted Navarrette regarding a petty theft citation that the City of Fresno's police department was investigating. Navarrette understood he was contacted because of concerns about Pinheiro's involvement in

---

[2] References to dates are to the year 2012, unless otherwise stated.

negotiations with units within the sheriff's department. According to Navarrette, he never contacted any law enforcement agency about Pinheiro and never disclosed information about him to law enforcement personnel.

For years it had been rumored that Pinheiro was involved in a romantic relationship with County employee Vanessa Salazar. On May 30, Paul Nerland, a County personnel services manager who supervised Salazar, gave Salazar a written reprimand for being absent without leave for being six minutes late to work, disappearing for 20 minutes, and giving inconsistent accounts as to where she was to her immediate supervisor, senior personnel analyst Larry Gomez. Gomez notified Nerland later that day that Salazar was seen complaining about the disciplinary action to co-worker Hollis Magill. Nerland interviewed Magill, who suspected there might be "domestic violence" involving Salazar and Pinheiro. Magill referred Nerland to Amy Ryals, a County personnel technician who Magill believed had more information that Ryals was afraid to bring forward.

Nerland and Bandy interviewed Ryals the following day. Ryals had been taking notes on what Salazar told her and what Ryals observed. Ryals spoke of the relationship between Salazar and Pinheiro, which she found disruptive and intimidating in the workplace. She was afraid of Pinheiro and felt that her supervisor, Gomez, treated Salazar more favorably than other employees because of her relationship with Pinheiro. On one occasion, Salazar came to work with a cut lip and bruised face, which Salazar attributed to Pinheiro. Ryals complained of working in a hostile environment which she was afraid to report due to Pinheiro's managerial position and Salazar's preferential treatment.[3]

---

[3] Salazar denies that she reported to anyone at the County that she was the victim of sexual harassment, domestic violence or workplace violence by Pinheiro, or that Pinheiro harassed her or was physically violent toward her.

Nerland and Bandy agreed that a preliminary investigation was necessary, which Nerland conducted. Nerland interviewed witnesses, and presented a final report and interview summaries to Bandy on June 15. It was clear to Bandy and Navarrette that an official investigation was necessary.[4] Because of Pinheiro's high profile and visibility, Nerland and Bandy recommended using an outside investigator. Navarrette suggested Richard St. Marie, who Bandy thought was a perfect choice as he previously worked as chief of security for the County and at that time, was employed by the Merced County Sheriff's Office. Nerland served as the primary liaison with St. Marie. Navarrette did not make the final decision as to who would be assigned to investigate the matter and did not direct St. Marie's investigation in any way.

In mid-July, Bandy notified Navarrette that the investigation was completed, or nearing completion, and she was awaiting St. Marie's report. Navarrette called St. Marie and obtained an overall summary of his findings. Navarrette claimed he felt compelled to formally advise Pinheiro's sister, Bernice Seidel, who was the clerk to the board of

---

[4] Pinheiro claims the investigation was not conducted in good faith and was commenced in retaliation for his having advised Navarrette and Bandy that they were violating state and federal law by unlawfully interfering with the efforts of the Service Employees International Union (SEIU) to represent its members, and supporting the County's correctional officers' attempt to separate from the SEIU or facilitating their acceptance into the Fresno Deputy Sheriff's Association. On May 22, the SEIU filed an unfair labor practice charge against the County, which alleged the County Sheriff had interfered with SEIU's efforts to represent its members and failed to remain neutral in the dispute. This charge was amended in October to also allege that during Pinheiro's testimony at a September evidentiary hearing on the petition to separate from SEIU, which was held before the Civil Service Commission, Pinheiro strongly suggested that County personnel above him, namely Navarrette and Bandy, were involved in the circulation, filing or processing of the petition. Both Navarrette and Bandy deny that Pinheiro ever warned them about the legalities associated with the County's position on this issue.

supervisors and reported directly to Navarrette, of the investigation and pending report, as he did not want her to learn of it through rumors or gossip.[5]

On July 13, Navarrette called Seidel into his office and told her that Pinheiro was being investigated for possible sexual harassment and workplace violence; he understood Pinheiro was not very cooperative during the investigation; and while he had not seen the report, the investigator had briefed him on it.[6] Navarrette asked Seidel to call her brother, Helder Pinheiro (Helder), to see if he would help, and said he would meet with Helder and answer his questions. Seidel agreed to do so.

Later that day, Helder called Navarrette and said Seidel had called him and he was interested in discussing what was going on with Pinheiro.[7] Navarrette met with Helder at a Fresno restaurant.[8] According to Navarrette, he told Helder he had been given an

---

[5] While Navarrette is Seidel's ultimate supervisor, Seidel claims she had little day-to-day interaction with him and she reported to another County employee. Seidel would not characterize their relationship as a "close working relationship," although Navarrette did ask her to have lunch with him on many occasions. Navarrette, however, claims that as clerk, Seidel was in his office frequently, and they had contact in the workplace at least every other day. Navarrette considered her to be a friend.

[6] According to both Pinheiro and Seidel, there was no reason for Navarrette to communicate with Seidel regarding Pinheiro's employment, as Pinheiro did not interact with Seidel as part of their job duties, during the last two to three years of Pinheiro's employment with the County he had been largely estranged from his family and Seidel had not spoken to him in some time. Pinheiro did not authorize Navarrette to speak with Seidel or provide her with information, nor did he ask Seidel to speak to Navarrette on his behalf. Pinheiro and Seidel worked in different departments, rarely saw each other, and had spoken very little during the year prior to July.

[7] While Helder knew Navarrette, Helder would not describe their relationship as "close." They had been together at several social functions, and Navarrette had invited him to lunch from time to time. Helder did not believe Navarrette had a reason to discuss Pinheiro's employment with him, noting that due to Pinheiro's estrangement from the family, he did not speak with Pinheiro often. Navarrette, however, considered Helder to be a friend.

[8] Pinheiro did not authorize Helder, who worked for the Fresno Unified School District, to speak on his behalf or represent him in dealings with the County, and never authorized Navarrette to disclose personal information about him to Helder.

6.

overview of the findings from the investigation report, which was due out the following week, and the findings were not favorable. Helder said he would speak with Pinheiro to get to the bottom of the allegations. Navarrette hoped that with Helder's encouragement, Pinheiro would be cooperative in trying to resolve the dispute.

According to Seidel and Helder, Navarrette made the following statements during his conversations with them: (1) Pinheiro seemed "to be angry and very volatile[,]" which had been going on for some time; (2) he had spoken with Pinheiro about three weeks before and there was "something going between this girl" and Pinheiro; (3) Pinheiro was having an affair with Salazar, who had "big tits[,]" was "trashy looking," and had been involved with other deputies in the Sheriff's Department"; (4) Pinheiro had stolen potato chips from sandwich shops "and a deputy saw it"; (5) Pinheiro was sexually harassing his co-worker, and was alleged to have hit her and treated her poorly; (6) when Seidel asked Navarrette if he thought Pinheiro was having an affair, Navarrette responded he was "having something with her" and Salazar had a young child; and (7) when Seidel asked him if he was saying that was Pinheiro's child, Navarrette stated he did not know.

Navarrette directed Helder to contact Pinheiro and discuss the issues with him, specifically whether he was willing to lose three months' pay to resolve the issue in lieu of termination. Helder agreed to do so. Later that evening, Helder met with Pinheiro, told him the contents of his conversation with Navarrette, and asked Pinheiro to call Navarrette the following day.

On July 14, Helder called Navarrette and told him he had spoken to Pinheiro and made clear that Pinheiro needed to come clean and explain himself. Helder said that Pinheiro was confused and acted defensively because he was caught off guard. Pinheiro called Navarrette a short time later and asked to talk to him about issues raised in the investigation. Navarrette met with Pinheiro and Bandy to try to better understand Pinheiro's position.

7.

On July 26, Pinheiro was the victim of a robbery on the way home from a second job he held as a "poker prop" at Club One Casino. Pinheiro claims he disclosed this job to Bandy, who did not object to it. According to Pinheiro, two perpetrators, apparently a prostitute and her pimp, jumped into his car when he was stopped and robbed him at which he believed was gunpoint. When first arrested, the woman claimed Pinheiro had solicited her for sex, and this claim was included in the draft police report. The perpetrators, however, later recanted and pled guilty to robbery charges. There was no further claim of improper conduct by Pinheiro, who stated the accusation was false.

Bandy received St. Marie's report around August 1. St. Marie stated in the report that he was asked to investigate the following areas: (1) potential sexual harassment involving Pinheiro and Salazar; (2) potential workplace violence with Salazar as the victim; (3) favoritism or implied favoritism as a result of a relationship between Pinheiro and Salazar; (4) whether promises were made as a result of the relationship; and (5) evidence of misconduct, including dishonesty, insubordination, misuse of work time, and workplace violence. With respect to Pinheiro, St. Marie sustained the allegations of insubordination, dishonesty, misuse of work time, and release of confidential information, but he could not determine whether workplace or domestic violence occurred, as Pinheiro and Salazar were uncooperative, argumentative and evasive during questioning, and Salazar denied telling co-workers that she had arguments with Pinheiro or that Pinheiro injured her. The sexual harassment charge was not sustained because Salazar stated she was not a victim of sexual harassment, and denied a sexual or dating relationship with Pinheiro.

Navarrette received the final investigative report, with an executive summary outlining the findings and conclusions, on August 3. He reviewed the summary with Pinheiro and told him that he was considering demoting him or, in the alternative, he could voluntarily agree to a demotion. Pinheiro refused, so Navarrette promised to go through the investigative materials in full before making a final decision. That same day,

8.

Helder called Navarrette wanting to know what he could do to help his brother. Navarrette discussed possible resolutions with Helder, including demotion, or transfer to another department or position. Helder suggested Navarrette change the minimum qualifications for a position in the Department of Social Services so Pinheiro would essentially get a promotion without challenging the investigation. Navarrette declined. Navarrette also spoke with Seidel. He told her that the investigation had been completed and the allegations of sexual harassment, hostile work environment and domestic violence had come back unfounded, but there were "inconsistencies." According to Seidel, Navarrette told her he could give Pinheiro a "small demotion" and, since Bandy would be gone in a year, Pinheiro could apply for her job.

On August 7, before Navarrette made a decision regarding corrective action, the District Attorney contacted him and explained there were concerns about Pinheiro's truthfulness in connection with the robbery. The prosecutor in the case was told that Pinheiro was soliciting an act of prostitution at the time of the robbery, and the case had been assigned to a "more senior attorney," who had represented the Fresno County Prosecutor's Association in labor negotiations with Pinheiro for a new union contract. Both the District Attorney and Navarrette were concerned about Pinheiro's credibility, possible conflicts of interest, and problems with future negotiations. Navarrette was advised that the robbery investigation disclosed that Pinheiro had a history of arrests for solicitation – one in 1987 for soliciting an act of prostitution and a second in 2001 for loitering for prostitution. The District Attorney gave Navarrette police reports regarding Pinheiro, but according to Navarrette, they did not indicate they were draft reports and he was not advised the information in them was incomplete or subject to change.

That same day, Navarrette asked Helder to meet him at a Fresno coffee shop. According to Helder, Navarrette had a large binder full of documents that he described as St. Marie's investigative binder and summary report, which he offered to Helder. He also gave Helder the opportunity to read several emails between Navarrette and Pinheiro.

Navarrette told Helder the investigator found the claims of sexual harassment, workplace violence, and domestic violence unsubstantiated, but there were some "inconsistencies." Navarrette handed Helder a "draft" police report of the July 26 robbery and told Helder that Pinheiro had been soliciting anal sex from a prostitute and been "popped" by her pimp, and Pinheiro had a "problem." Finally, Navarrette said that Pinheiro had been arrested in 1997 for solicitation of prostitution and had to enter a program for sexual addiction.[9] Navarrette stated he obtained this information from the District Attorney's office, and could "get in trouble" for sharing it with Helder. According to Navarrette, however, Helder obtained a copy of the police report of the robbery on his own, without Navarrette's assistance. Helder told Seidel and Pinheiro about his conversation with Navarrette.

After speaking with Helder, Navarrette returned home and found Seidel parked in front of his house with some tomatoes, which she gave to him. According to Seidel, Navarrette told her that District Attorney Elizabeth Egan brought him a police report that showed Pinheiro had been robbed, but the woman claimed he "was soliciting anal sex." Navarrette also stated that Pinheiro "was popped in 1997 for prostitution and that he entered a program as he had a sexual addiction. Your brother has a problem – anal sex." Navarrette told Seidel he did not understand, "John professes to love his wife and children yet he will go to the mat?" He also stated that Pinheiro would "win a couple hundred thousand dollars, but his career is completely over. You know what I did to Ralph Jimenez! I went after his girlfriend. That is exactly what I did to your brother John. Bernice, I will get 95% of my pay, you will be fine, but your brother's career is

_____

[9] Navarrette denies making any statements about anal sex or sexual addiction to Helder or Seidel. While he may have referred to an arrest in 1997, he misspoke because he was provided documentation on a 1987 citation for solicitation of sex. Any reference to a prior arrest was to emphasize his reasons for wanting a discreet resolution of the matter to spare Pinheiro embarrassment.

over." Navarrette, however, claims he told Seidel it appeared Pinheiro was a victim in the robbery and it would have no bearing on the decision regarding his employment. The next day, Seidel came to Navarrette's office and stated that Pinheiro could explain facts in the police report.

Thereafter, Navarrette determined there was no point in continuing to attempt an informal resolution. After reviewing all of the materials that were part of the investigative report, he asked Bandy, who had the authority to hire and fire within the personnel services division, for her recommendation regarding Pinheiro's employment. Bandy recommended termination based on St. Marie's report, her personal observations of Pinheiro's behavior, and her understanding that he made untrue accusations about Bandy during the investigation. Navarrette agreed with the recommendation. Navarrette claims his decision was not based on the robbery, past arrests or citations for solicitation, the alleged affair between Pinheiro and Salazar, or negotiations between the correctional officers and SEIU, but instead was based on serious issues of dishonesty, lack of cooperation, insubordination and lack of trust.

*Disciplinary Proceedings*

In August, Pinheiro was placed on administrative leave pending disciplinary action. Pinheiro requested a *Skelly*[10] hearing in connection with the order, which was conducted on October 1 by then Chief Probation Officer Linda Penner. Penner recommended the intended action to terminate Pinheiro's employment. Thereafter, Bandy signed the Order for Disciplinary Action (order), notifying Pinheiro that he was dismissed from his position based on violations of County personnel rules.

Pinheiro appealed the *Skelly* determination. In February 2013, several days of hearings were held before the civil service commission (Commission). A reporter from the Fresno Bee was present on the first day of the hearing. The hearing officer

---

[10] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

11.

announced that the hearing was an open one unless the employee stipulated otherwise. Pinheiro confirmed on the record that he was not requesting a closed hearing. Bandy saw that the reporter had a copy of the order with him at the hearing. Bandy denied providing the order to the media. Following the hearing, the Commission denied Pinheiro's appeal, as the County had just cause to terminate Pinheiro's employment based on findings that he engaged in theft, disclosed confidential information, and made untruthful statements.

Navarrette was not involved in the procedures for separation, including preparation of the order and the *Skelly* hearing. According to Navarrette, his actions in this matter were in his capacity as CAO, including notifying Seidel of the pending investigation. Navarrette claims that later contacts that Pinheiro's family members initiated were not part of the investigation, and he participated as a family friend trying to resolve a difficult employment situation. Navarrette claims he did not disseminate any documents regarding criminal activities or the robbery of Pinheiro to anyone, and never contacted or spoke to anyone associated with the Fresno Bee or any media outlet about Pinheiro. Navarrette denied making false statements regarding Pinheiro and explained that his responses to Helder and Seidel were only his opinion on the seriousness of the investigation based on information the investigator provided him.

Navarrette was not involved in the investigation of Pinheiro, and he did not tell St. Marie how to conduct his investigation or suggest the conclusions he should reach. Navarrette did not discuss the investigation with anyone outside of County management with the exception of Pinheiro's siblings. He spoke to the siblings only to try to convince Pinheiro to speak frankly about the issues and consider a way to resolve them. Navarrette believed Helder and Seidel were communicating with their brother, and Pinheiro was keeping them informed about the investigation.

Bandy claimed she never disseminated any information regarding arrests or citations outside the official investigation, and denied disclosing information regarding the investigation except in the context of the official investigation. According to Bandy,

all of her communications concerning Pinheiro were made in an official capacity and in compliance with the separation process, and she never made false statements regarding him. Her recommendation for termination had nothing to do with a purported extra-marital affair, union activities concerning the correctional officers' efforts to sever affiliation with SEIU, or any warnings Pinheiro allegedly made of illegal activity by the County.

*Bandy's Alleged Defamatory Statements*

Pinheiro claims that over the past few years before his dismissal, Bandy treated him with disdain despite the positive evaluations he received, which he attributed to: (1) Helder's participation in an investigation of Bandy's brother, who also worked for FUSD, that resulted in her brother's forced resignation from the district; and (2) Bandy's accusation to him that he was having an affair and her unsolicited statements to that effect to third parties. According to Pinheiro, both Bandy and Navarrette openly discussed, shared as fact, and republished the false statements Navarrette shared with Helder and Seidel. He also asserted that Bandy shared false and defamatory statements before, after and outside of the investigation, to County employees and others, that: (1) he had taken Salazar on work-related trips to continue their alleged affair; (2) he had been directed not to have contact with Salazar; and (3) he and Salazar were taking days off at the same time so they could be together. Pinheiro also claimed Bandy made numerous false and defamatory statements about his attitude and work performance, which were calculated to harm his personal and professional reputations.

Salazar claims that on a number of occasions before and outside the investigation, she heard Bandy make factual assertions and accusations that she was having an affair with Pinheiro. Salazar could remember two such incidents that occurred from 2010 through 2012, when the investigation began. The first was a meeting Salazar had with Bandy and Nerland, when they advised her she had not received a promotion. During the meeting, Bandy stated she, Nerland and other employees knew Salazar was having a

13.

romantic relationship with Pinheiro, people saw the two together, and everyone was talking about it. Bandy stated something to the effect that she knew it was more than just rumors, and she and Pinheiro could ruin their careers at the County if they wanted to. Salazar responded that she could not control what people see, and it seemed odd to make these comments, because it suggested that was the reason she did not get the promotion. Bandy made it clear that she was not asking about an affair or suggesting it was an unfounded rumor; instead, she "believed" and "knew" they were having an affair, and she and other County employees were talking about it.[11]

The other incident occurred on May 24, when Salazar came into the office late. Her supervisor, Gomez, told her that Bandy was looking for her, knew she was late, and Bandy told him she "knew" Salazar was having an affair with Pinheiro, and she must have been late because she was with him. Gomez told Salazar Bandy made specific factual assertions that Salazar was "riding" with Pinheiro that day and was late due to their purported sexual affair. Bandy, however, denies ever stating that she knew the two were having an affair.

*This Lawsuit*

Pinheiro initiated this lawsuit against respondents on August 12, 2013, when he filed his original verified complaint.[12]  On October 25, 2013, Pinheiro filed a first

---

[11] According to Bandy, this meeting occurred in November 2010. Bandy denies ever stating that Pinheiro and Salazar were in a sexual relationship. Bandy had no independent knowledge that the two were involved in an affair, although she believed they were. Bandy denied making any employment decision affecting Pinheiro based on an opinion or assumption of marital infidelity.

[12] The original complaint contained causes of action for wrongful termination, retaliation, defamation, various theories of invasion of privacy, failure to maintain records properly, improper disclosure of personal information from records, intentional disclosure of personal information from a government record, violation of Labor Code section 432.7, and intentional and negligent infliction of emotional distress. The original complaint also named Ryals and St. Marie as defendants, who were dropped as defendants in the first amended complaint.

amended verified complaint (FAC), alleging causes of action for defamation; invasion of privacy under the theories of false light, intrusion, and public disclosure of private facts; intentional disclosure of personal information from government records; and intentional infliction of emotional distress (IIED).

The FAC alleges that Navarrette and Bandy targeted Pinheiro for removal from his position as the County's labor relations manager after he warned them of their illegal conduct in trying to break the SEIU and unlawfully assisting the correctional officers to modify their bargaining unit, break away from the SEIU and either become independent or join the Fresno Deputy Sheriff's Association, and there were no grounds for his termination. The FAC seeks relief for various causes of action that accrued against the County and its employees to provide the cover of an investigation so that Navarrette and Bandy could fire Pinheiro, and the unlawful conduct alleged therein resulted in the improper disclosure of arrest, citation and investigative records – first to Navarrette, Bandy and St. Marie, and then to other third parties, including Helder, Seidel, a local union, and the local media.

With respect to the defamation cause of action, the FAC alleges that respondents made untrue oral and written statements regarding Pinheiro, including: (1) Pinheiro had been having a sexual affair with Salazar for years; (2) Pinheiro shoplifted from fast food restaurants located near the County's office building; (3) Pinheiro had solicited, or attempted to solicit, a prostitute when he was the victim of a robbery in July; (4) Pinheiro was convicted of engaging prostitutes in 1987 and 2001, and convicted of crimes of solicitation during those time periods; (5) Pinheiro shared confidential personnel information with Salazar; (6) Pinheiro made threatening statements or gestures to Ryals which caused her to fear for her safety; and (7) Pinheiro physically hit or punched Salazar, and perpetrated domestic violence against her. The FAC alleges these false statements were published to third parties, including Pinheiro's family members, SEIU representatives, law enforcement, and the general public and media, for the purpose of

15.

damaging Pinheiro's personal and professional reputation in the community, as well as to justify the wrongful termination of Pinheiro's employment, before, during and after any investigation took place.

The second cause of action for invasion of privacy, false light, alleges respondents knew or should have known that the same false statements would be communicated to the general public, and in fact were published to the general public through the local media, including the Fresno Bee. The statements are alleged to have constituted an unwarranted and unlawful invasion of privacy, and created an unfair, false and inaccurate description of Pinheiro, which placed him in a false light to a large number of third persons, including Pinheiro's family, and to the general community.

The third cause of action for invasion of privacy, intrusion, alleges that respondents intentionally and without consent intruded into private and confidential information from Pinheiro's personnel and other County records, including records of investigation, citation and arrest the District Attorney's office maintained, which were not for public viewing or consumption, and then disclosed that information to Pinheiro's family members, the public and the local media. The FAC alleges that Pinheiro had an objectively reasonable expectation that the information would remain private and confidential, and would not be disclosed or used against him without his consent.

The fourth cause of action for invasion of privacy, public disclosure of private facts, alleges that respondents publicly disclosed private facts about Pinheiro to his family members, co-workers, the public and the local media, including personnel records, arrest records, investigation records from government sources, and the contents of City and County investigation reports, including that (1) Pinheiro shoplifted from fast food restaurants, (2) he was soliciting or attempting to solicit a prostitute when he was a robbery victim in July, and (3) he was arrested or cited for solicitation and loitering in 1987 and 2001.

16.

The last cause of action for IIED alleges that Navarrette and Bandy's actions were done intentionally and with the intent to inflict severe emotional distress on Pinheiro, and in fact caused him to suffer severe emotional distress.[13]

*The Anti-SLAPP Motion*

Respondents filed a motion to strike the first through fourth causes of action for defamation and invasion of privacy, and the last cause of action for intentional infliction of emotional distress, under the anti-SLAPP statute.[14]  They argued that Pinheiro's claims arose from protected activity under (1) section 425.16, subdivision (e)(2), as the alleged statements were made in connection with an issue under consideration or review in an official proceeding, and (2) section 425.16, subdivision (e)(4), as the alleged statements were made in connection with an issue of public interest.  Respondents further argued that to the extent the FAC alleges both protected and unprotected activity, such as that Navarrette improperly disclosed information and made defamatory statements to Pinheiro's brother and sister, the alleged unprotected activity was "merely incidental" to Pinheiro's claims based on protected activity, and therefore respondents were still entitled to anti-SLAPP protection.

Respondents asserted that Pinheiro could not satisfy his burden to show a substantial probability of prevailing on his claims for the following reasons: (1) respondents are immune from liability under Government Code sections 821.6 and 822.2; (2) the litigation privilege of Civil Code section 47 bars the defamation claim; (3) Pinheiro cannot prove respondents knew the alleged defamatory statements were false

---

[13] The last cause of action for intentional infliction of emotional distress is labeled the "Eleventh Cause of Action[,]" although it is actually the sixth cause of action alleged in the FAC.

[14] The fifth cause of action for intentional disclosure of personal information from government records was not subject to respondents' anti-SLAPP motion.  Respondents, however, demurred to that cause of action.  The trial court sustained the demurrer without leave to amend.

or untrue; (4) since the defamation claim fails, so does the false light invasion of privacy claim; (5) the intrusion into private affairs claim fails because Pinheiro did not have a reasonable expectation of privacy in the records and any intrusion would not be highly offensive to a reasonable person; (6) the claim for public disclosure of private facts fails because the private facts objected to were truthful commentary on the activities of a public official, were not communicated to the public at large, and were of legitimate public concern; and (7) since the defamation and invasion of privacy claims fail, so does the IIED claim.

In his opposition to the motion, Pinheiro argued respondents failed to meet their burden of showing that his claims arose from protected activity because the personnel investigation was not an issue of public interest and the gravamen of his claims were Navarrette's and Bandy's statements made before or outside the investigation. Pinheiro further argued he had made a prima facie case of misconduct by respondents as: (1) Navarrette's and Bandy's statements were not privileged, as they were not made in connection with the Commission proceeding or the investigation; (2) he had a reasonable expectation of privacy in his sexual affairs, personnel records and police reports; and (3) respondents' actions constitute intentional and outrageous conduct that supports a cause of action for IIED.

After oral argument on the motion, the trial court adopted its tentative ruling granting it. The trial court found that protected speech was involved, as the FAC "paints a picture of a man wrongfully pushed out of his job by a trumped up false set of allegations fed to the public and media. The problem for plaintiff is that the process of terminating him, as a public employee, had to be and was undertaken via an investigati[on], hearing, and then a further Civil Service Commission proceedings – an official government proceeding fully covered by Civil Code section 47. Statements made in preparation for or to prompt investigation that might result in the initiation of official proceedings [are] protected by [the] litigation privilege. *Hagberg v. California Federal*

18.

*Bank* (2004) 32 Cal.4th 350, 368. [¶] The gravamen of this action is speech connected with an official proceeding about a person who was a public figure in the County of Fresno at the time, involved in labor negotiations of great public interest, where his credibility was an important factor in success. The burden therefore shifts to plaintiff to show the causes of action at issue have merit."

With respect to the merits, the trial court found that the defamation claim should be stricken because (1) the "vast majority" of the statements "targeted" in the FAC fall under the litigation privilege of Civil Code section 47; (2) the discussions with the siblings occurred as a means to convince Pinheiro to settle the matter, thereby making them privileged; (3) almost everything Navarrette and Bandy said about Pinheiro came from other sources, which also were revealed to the siblings, so the statements were not false; and (4) any remaining actionable defamation was negligible. The trial court further found the privacy claims should be stricken because (1) Civil Code section 47 applied to those claims as well, noting that Pinheiro consented to the public disclosure of information by not requesting a closed Commission hearing, and (2) the information disclosed did not involve private matters. The trial court did not rule on the various evidentiary objections the parties raised.[15]

---

[15] With their reply, respondents filed nearly 100 written objections to Pinheiro's evidence. On appeal, respondents request this court to rule on these objections. The trial court's failure to rule indicates that it overruled the objections. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [in summary judgment context, objections the trial court did not rule on are preserved for appeal; objecting party has burden to renew objections in appellate court].) While respondents preserved this issue for appeal, they have failed to meet their burden of demonstrating that the trial court's implied overruling of their objections was error, as they do not discuss each objection or set forth legal argument or authority to support their challenge. (Cal. Rules of Court, rule 8.204(a)(1)(B) [each point must be supported by argument and, if possible, by citation of authority].) Therefore, they have abandoned this issue. (See, e.g., *Salas v. California Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [failure to demonstrate how each evidentiary ruling was erroneous constitutes a forfeiture of challenge].)

## DISCUSSION

The anti–SLAPP statute is intended to address a problem with meritless lawsuits filed to "chill" the exercise of the constitutional right of free speech. (§ 425.16, subd. (a).) As relevant here, section 425.16, subdivision (b)(1) states: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

A court ruling on a motion under the SLAPP statute must go through a two-step process. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon Enterprises*).) First, the court must determine whether the moving defendant has made a threshold showing that the challenged causes of action arise from protected activity, that is, activity by defendants in furtherance of their constitutional right of petition or free speech. (*Ibid.*) The protected acts include: (1) written or oral statements made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) written or oral statements made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) written or oral statements made in a place open to the public or in a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional rights of petition or free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e).)

Second, if the court finds that the defendant has met its initial burden, it then determines whether the plaintiff has demonstrated a probability of prevailing on its claim. (*Equilon Enterprises*, *supra*, 29 Cal.4th at p. 67.) To satisfy this prong, "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a

20.

sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

On appeal, we review the anti-SLAPP motion de novo to determine whether the parties have met their respective burdens. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3; *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 79.)

### *Protected Activity*

With this background, we turn to the first step of the SLAPP analysis: whether respondents met their burden of showing that the causes of action alleged arose from protected activity.

"In assessing whether a cause of action arises from protected activity, ' "we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action . . .'". . . . We assess the principal thrust by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]" [Citation.]' [Citation.] '[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech.' [Citation.] [¶] When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, 'courts must be

21.

careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. "[C]auses of action do not arise from motives; they arise from acts." [Citation.]' [Citation.] ' "The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable." ' " (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1520.)

Here, a review of the FAC reveals that the five causes of action that were the subject of the anti-SLAPP motion are based on essentially the same injury-producing conduct, namely the publication of defamatory statements and private information to third parties, including Pinheiro's family members, SEIU representatives, law enforcement, the general public and the local media. Specifically, the FAC alleges that in July and August, before the results of the investigation were provided to Bandy, Navarrette told Pinheiro's siblings that Pinheiro allegedly was having an affair with Salazar, he had been arrested or cited for solicitation in 1987 and 2001, and he engaged in similar conduct when he was a victim of robbery in July. The FAC further alleges that Navarrette asked the siblings to talk to Pinheiro and convince him to either accept a demotion or leave the County to "save his family" from embarrassment and shame. In opposing the anti-SLAPP motion, Pinheiro produced evidence that Bandy made statements before the investigation began that Pinheiro and Salazar were having an affair.

The issue is whether this injury-producing conduct is protected activity under either section 425.16, subdivision (e)(2) or (4). We begin with subdivision (e)(2), which defines protected activity to include written or oral statements that are made in connection with an issue that is under consideration or review at a proceeding authorized by law. Where, as here, a defendant bases its anti-SLAPP motion on subparagraph (2) of subdivision (e)(2), it "need not 'separately demonstrate that the statement concerned an issue of public significance.' " (*Kibler v. Northern Inyo County Local Hosp. Dist.* (2006) 39 Cal.4th 192, 198 (*Kibler*).)

22.

The parties agree that the investigation, *Skelly* hearing, and Commission hearing were all official proceedings authorized by law. They disagree, however, on whether the statements allegedly made to third parties were made in connection with an issue under consideration or review in any of those proceedings. Pinheiro contends that Navarrette's and Bandy's statements were made either before or outside the investigation, and did not arise from or further the investigation. Respondents contend the statements were made as part of the investigation and in anticipation of official proceedings.

Communications related to, preparatory to, or in anticipation of litigation, are protected speech for purposes of section 425.16. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [petition-related statements are protected under the anti-SLAPP statute].) A statement is in connection with litigation under section 425.16, subdivision (e)(2) if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation. (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266.)

While Navarrette's statements to Seidel and Helder arguably related to the substantive issues in the investigation, they were not made to persons having an interest in the investigation. Seidel and Helder were not witnesses to the alleged misconduct and had no authority over Pinheiro's position. Helder was not even a County employee. Communications to people outside an employer's internal investigation into an employee's alleged misconduct are not made in furtherance of one's right of free speech. (*Robinson v. Alameda County* (N.D. Cal. 2012) 875 F.Supp.2d 1029, 1050 [defendant's statements made to individuals outside of internal affairs investigation not protected speech under anti-SLAPP statute].)

Respondents contend the fact the siblings were not percipient witnesses does not mean they were unconnected to official proceedings, citing *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 (*Dove Audio*), and *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8 (*Ludwig*). Their reliance on these cases,

23.

however, is misplaced. In *Dove Audio*, the statement at issue was a law firm's letter sent to celebrities who had participated in the recording of an album, and charities who were to benefit from the sales proceeds of that recording, seeking support for its petition to the Attorney General for an investigation of the plaintiff's royalty payments to those charities. (*Dove Audio*, *supra*, 47 Cal.App.4th at pp. 779-780, 784.) The celebrities and charities clearly had an interest in the law firm's efforts to obtain royalties to which they arguably were entitled. In *Ludwig*, the court determined that the defendant's activities of encouraging other to file lawsuits over, and speak out against, a mall development, were protected under section 425.16, as they involved matters of public interest. (*Ludwig*, *supra*, 37 Cal.App.4th at pp. 14-15, 18.) In contrast here, with respect to the applicability of section 425.16, subdivision (e)(2), the issue is not whether the statements were made on a matter of public interest, but whether they were made in connection with official proceedings. Given that the statements were made to third parties who did not have an interest in the litigation, they were not.

Respondents assert that there are "myriad examples of circumstances where comparable lawsuits were stricken as SLAPP suits," citing to *Miller v. City of Los Angeles* (2008) 169 Cal.App.4th 1373, *Kibler, supra,* 39 Cal.4th 192, and *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537. But none of these cases involved statements made to third parties who did not have an interest in the investigation or official proceeding at issue.

Respondents contend that Navarrette's conversations with Pinheiro's siblings were connected to the investigation because they were settlement discussions, which are entitled to protection under the litigation privilege of Civil Code section 47.[16] Although

___

[16] Civil Code section 47 states, in pertinent part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding, (3) in any other official proceeding authorized by law, . . . " California courts have given the privilege expansive application. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29.)

the anti-SLAPP statute and the litigation privilege are not coextensive, courts may "look[] to the litigation privilege as an aid in construing the scope of subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry – that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivisions (e)(1) and (2)." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323.)

" 'The usual formulation [of the litigation privilege] is that [it] applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' [Citation.] [¶] The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. [Citation.] . . . [T]he privilege has been extended to . . . *all* torts other than malicious prosecution. [Citations.] . . . [¶] If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law. [Citation.] Any doubt about whether the privilege applies is resolved in favor of applying it." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 912–913 (*Kashian*).)

The privilege, which is both absolute and broadly construed, has been held to apply to statements made in connection with proposed litigation that is "contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251; *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919.) It applies to demand letters and attorneys' prelitigation communications. (*Dove Audio, supra,* 47 Cal.App.4th at p. 781.) And, so long as the communication is connected to or bears a logical relationship with proposed litigation, it applies without regard to "motives, morals, ethics or intent." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 220; *Kashian, supra,* 98 Cal.App.4th at p. 913 [privilege applies "regardless [of] whether the communication was made with malice or the intent to harm"].)

Here, Navarrette's communications to the siblings were not the type of pre-litigation communications subject to the litigation privilege. According to Navarrette, when he first spoke with Seidel, he did so because he "felt compelled" to advise her of the investigation and report as he did not want her to learn of it through rumors or gossip, not because she had some connection to the investigation or settlement authority. He first met with Helder and gave him an overview of the findings because he hoped that with Helder's encouragement, Pinheiro "would be forthcoming and cooperative in trying to resolve the dispute." Navarrette's later contacts with the siblings "were not part of any investigation and [his] participation was as a family friend trying to resolve a difficult employment situation." He spoke with them to try to have them convince Pinheiro "to speak frankly about the issues and to consider a way to resolve them."

While Navarrette spoke to the siblings because he hoped they would encourage Pinheiro to accept a quiet resolution of the investigation, Navarrette was not speaking to them as a representative of the County, but rather as a friend. There is no evidence that the siblings were authorized representatives of Pinheiro with respect to the investigation and subsequent proceedings involving his dismissal. In this situation, they merely acted, at best, as conduits of Navarrette's message that Pinheiro was in serious trouble and should be open to resolving the matter. Navarrette's statements to the siblings were not covered by the litigation privilege. Accordingly, they do not constitute protected activity under section 425.16, subdivision (e)(2).

Alternatively, respondents contend that Navarrette's statements to the siblings fall into the last category of section 425.16, subdivision (e), because they were made "in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) Respondents offer several theories to support their contention. They argue the alleged statements are protected because they pertain to the following issues of public interest: (1) the qualifications of, and Pinheiro's position as, the County's labor negotiator;

(2) misconduct by government officials in the conduct of public business; (3) labor negotiations affecting public salaries and benefits, and potential conflicts of interest in bargaining units; and (4) workplace safety and domestic violence. They also contend that the public has an interest in Pinheiro's conduct because he is a limited public figure. Respondents assert that since all of the alleged misconduct was related to an official investigation into wrongdoing, which is in the public interest, section 425.16 applies.

"Section 425.16 does not define 'public interest' or 'public issue.' . . . Some courts have noted commentary that ' " 'no standards are necessary because [courts and attorneys] will, or should, know a public concern when they see it.' " ' " (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 371-372.) Courts have broadly construed the term "public interest" "to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.)

Generally, the definition of "statements made in connection with a public issue" focuses on whether the statements: (1) concern a person or entity in the public eye; (2) relate to conduct that could directly affect a large number of people beyond the direct participants; or (3) involve a topic of widespread, public interest. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 (*Wilbanks*); *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.) As to the last category, not only must the statement refer to a subject of widespread public interest, it also must contribute to the public debate in some manner. (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) It has been held that where an issue is not of interest to the public at large, but rather to a limited but definable portion of the public, "the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public

significance." (*Du Charme v. International Brotherhood of Electrical Workers, Local 45* (2003) 110 Cal.App.4th 107, 119.)

Not every statement about a person in the public eye is sufficient to meet the public interest requirement of section 425.16, subdivision (e)(4). (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 936.) Instead, " 'there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest is not sufficient. Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy.' " (*Ibid.*)

At best, the evidence in this case shows some public interest in Pinheiro's role as the County's chief labor negotiator. But there is no evidence of a *public* controversy concerning him when Navarrette spoke with Pinheiro's siblings, or when Bandy made statements concerning an alleged affair. The statements did not concern Pinheiro's performance as a labor negotiator or implicate him in misconduct relative to his position. Moreover, Navarrette did not make the statements as part of, or to engender, a discussion on a public issue; instead, he made them in an effort to resolve the matter informally and privately. While, as respondents point out, Pinheiro permitted a media representative to attend the Commission hearing in February 2013, and newspaper articles were published in 2013 regarding that hearing and his subsequent lawsuits, his alleged misconduct was not public when the statements were made.

Even if Pinheiro was a limited purpose public figure, he lost protection for his reputation only to the extent Navarrette's and Bandy's statements related to his role in a public controversy. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253 [explaining that a limited purpose public figure is someone who " 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' [Citation.] Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public

28.

controversy."]; see *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190.) The only public controversies that Pinheiro arguably was involved in at the time the statements were made were labor negotiations with various employee groups. The statements, however, certainly had nothing to do with negotiations Pinheiro was engaging in on the County's behalf.

Respondents assert that domestic violence, workplace safety, and curbing sexual harassment and abuse, are all matters of public interest. While this may be true, we agree with Pinheiro that this case, at least at the time the statements at issue allegedly were made, involved a workplace dispute among a small number of people. Such disputes do not implicate a broader public interest subject to a motion to strike under section 425.16, subdivision (e). (*Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, 1511 [holding that while elimination of sexual harassment implicates a public interest, a private employer's investigation into a harassment claim that concerned a small group of people did not rise to a public interest under section 425.16].)

Respondents argue that even if Bandy's and Navarrette's statements were not protected under either section 425.16, subdivision (e)(2) or (e)(4), respondents still are entitled to anti-SLAPP protection because the statements were merely incidental to Pinheiro's "core claims" of an alleged pretextual investigation and termination, which constitute protected activity. (See *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1245 [where a cause of action alleges both protected and unprotected activity, the cause of action is " 'subject to section 425.16 unless the protected conduct is "merely incidental" to the unprotected conduct' "].) But as we have already explained, statements to third parties, including Navarrette's and Bandy's statements, are the thrust or gravamen of Pinheiro's claims. While the FAC does contain detailed allegations of the circumstances surrounding the investigation and Pinheiro's termination, including his retaliation claim, a close examination of each cause

of action reveals that it is the statements to third parties, not the investigation or his termination, that constitute the thrust or gravamen of his claims.

In sum, the gravamen of Pinheiro's claims was not protected activity under the anti-SLAPP statute. Because respondents failed to demonstrate the claims against them arose from protected activity, we have no occasion to address the merits of those claims. (*Loanvest I, LLC v. Utrecht* (2015) 235 Cal.App.4th 496, 505.)

## **DISPOSITION**

The judgment is reversed. Costs on appeal are awarded to Pinheiro.


_____
GOMES, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
FRANSON, J.